DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6747
    FAX: (415) 436-7234
    Ross.weingarten@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>LENIER LACEY,<br><br>    Defendant. | **CASE NO. CR 19-160 SI**<br><br>**UNITED STATES' SENTENCING MEMORANDUM**<br><br>Sentencing Date:   July 31, 2020<br>Time:                 11:00 a.m.<br>Judge:               Hon. Susan Illston |

## I. INTRODUCTION

Defendant Lenier Lacey stands before the Court to be sentenced on July 31, 2020 following his guilty plea to Count One of the above-captioned Indictment, charging him with Possession of Machineguns, in violation of 18 U.S.C. § 922(o). Little is disputed in this case. In March 2019, authorities at San Francisco International Airport intercepted a package containing two full automatic converter switches, which are devices that transform semi-automatic handguns into fully-automatic machineguns. These devices are known colloquially as "Glock switches." Law enforcement executed a mock delivery and then a search warrant at the address to which the package was addressed. Inside the residence, where the Defendant was present, officers found two more Glock switches, numerous tools and molds used to make handguns, as well as dozens of rounds of ammunition and a semi-automatic SKS rifle.

The defendant pled guilty in July 2019 to a plea agreement pursuant to Rule 11(c)(1)(B). Sentencing in this case has been delayed numerous times, in large part because of the COVID-19 pandemic. The defendant is now set to be sentenced on July 31, 2020. A custodial sentence is necessary in this case due to the dangerousness of the conduct, specifically ordering parts to manufacture machineguns and possessing a firearm, ammunition, and tools to make guns. There are, however, mitigating circumstances in this case that suggest that a sentence at the low end of the Guidelines range is appropriate. Accordingly, the government respectfully requests that the Court sentence the defendant to 24 months in prison, to be followed by three years of supervised release, the expanded search condition and other conditions of supervision recommended, forfeiture of the firearm, Glock switches, gun manufacturing tools, and ammunition involved in the offense, and a mandatory special assessment of $100.

## II. OFFENSE CONDUCT

The PSR sets forth the offense conduct in this case. PSR ¶¶ 5-9. In March 2019, law enforcement authorities at the San Francisco International Airport intercepted a package pursuant to their border authority that contained two devices known as "Glock switches."[1] PSR ¶ 6. Glock

---

[1] The term "Glock switch" is a colloquial one used for a device that converts semi-automatic weapons to fully-automatic weapons. They are not associated with the firearms manufacturer Glock, nor do they

switches are small devices that do not operate as firearms on their own, but when inserted into a semi-automatic handgun, transforms that handgun into a fully-automatic machinegun. As the Court is aware, a semi-automatic weapon in one that shoots one projectile (bullet) each time the trigger is pulled; a fully-automatic gun, by contrast, fires a continuous stream of bullets as the trigger is held down, making it possible for the shooter to fire large numbers of ammunition in a very short period of time. There is no question that fully-automatic machineguns are more dangerous and more deadly than semi-automatic guns. Pursuant to 18 U.S.C. § 921(a)(23) and 26 U.S.C. § 5845(b), a Glock switch on its own is considered a machinegun because it is a "part designed and intended solely and exclusively…for use in converting a weapon into a machinegun." 26 U.S.C. § 5845(b)

The package containing two Glock switches that was intercepted at the airport was addressed to Kristie Spingola at an address in San Francisco. PSR ¶ 6. Law enforcement learned through database checks that two prior packages from the same sender, based in China, were delivered to Ms. Spingola at the same address in early 2019. *Id*. This led law enforcement to believe that the person who ordered the two Glock switches had previously ordered more. As a result, on March 15, 2019, law enforcement executed a mock delivery to Ms. Spingola—delivering a package meant to look like the one containing the Glock switches, but which actually contained no contraband—and she signed for the package. *Id*.

At that point, law enforcement then executed a state search warrant at the residence. *Id*. ¶ 7. The defendant was present at the time and came to the door. Although Ms. Spingola told officers that the defendant lived in Sacramento, she said that he spent a lot of time at the San Francisco address, and officers found mail addressed to the defendant in the bedroom. Inside the defendant's bedroom, officers found numerous items suggesting that the defendant built and owned firearms. Specifically, law enforcement found a bag containing two Glock switches and the packaging those devices were shipped in from the sender in China, confirming that the defendant had previously ordered and received Glock switches through the mail. *Id*. Also in a bag in the bedroom, officers found Glock magazines, one of which was loaded with .357 ammunition, as well as an empty box for a 50-round Glock drum magazine, which would allow a handgun to hold up to 50 rounds of ammunition at one time. Another bag

---

only work on Glock firearms.

contained 34 more rounds of 9mm ammunition and gun parts. Troublingly, fficers also found four 80% frame molds used to manufacture handguns, as well as tools used to manufacture guns using those molds. Finally, under the bed in the bedroom, officers found a black bag containing a semi-automatic SKS rifle, two magazines (one of which was loaded), 70 rounds of loose unfired ammunition, and a black mask.[2] *Id*. In the bedroom, there was also a Glock store catalog from which customers can buy guns and gun accessories.

In his post-arrest interview, the defendant admitted ordering the Glock switches through the mail, and that that he built firearms for his family that he was going to take them with him to Nevada. *Id*. ¶ 7. He also admitted to ordering the gun molds through the mail, which he used to build the firearms. *Id*. According to the defendant, he got the idea to build a Glock as a "collector's item" and for protection. He told law enforcement that he made three or four Glock-style guns in total and gave them to his cousins in Las Vegas. The defendant also alluded to building other types of guns—he said he built "a lot of nines and fortys"—but was not specific about how many guns he built or where they are. Finally, he admitted that he had previously handled the SKS rifle that was found under his bed, although he denied that the rifle belonged to him. *Id*. In sum, the defendant admitted that he purchased molds to build guns, and then purchased Glock switches to make them fully automatic machineguns.

## III. CRIMINAL HISTORY

The PSR accurately sets forth defendant's criminal history. PSR ¶¶ 24-35. The defendant has three adult convictions, including one felony conviction for carrying a concealed weapon, but all of his convictions are more than a decade old and too old to count for purposes of calculating his criminal history. Therefore, the government agrees that the defendant is in Criminal History Category I. The government notes, however, that his felony conviction from 2009 consisted of him fleeing from police officers and throwing a Glock handgun into a swimming pool as he attempted to evade law enforcement. The defendant admitted in the course of that investigation that he was a gang member. *Id*. ¶ 29.

//

---

[2] It should be noted that in another bedroom that did not belong to the defendant, officers found a Smith and Wesson revolver under a mattress. The government does not believe this gun belonged to, or is attributable to, the defendant.

U.S. SENTENCING MEMORANDUM   4
CR 19-160 SI

## IV. SENTENCING GUIDELINES CALCULATIONS

Pursuant to the plea agreement, the parties agreed that the defendant's total offense level is 17. According to the parties' calculation, defendant's base offense level is 18 pursuant to U.S.S.G. § 2K2.1(a)(5). Two points are added because the offense involved between three and seven firearms.[3] U.S.S.G. § 2K2.1(b)(1)(A). A three point reduction for acceptance of responsibility results in a final offense level of 17. Probation agrees with the defendant's Guidelines calculation. PSR ¶ 23. Probation calculates defendant's criminal history score to be a 0, which places him in Criminal History Category I. Given that his total offense level is 17, the defendant faces a Guidelines range of 24-30 months.

## V. SENTENCING RECOMMENDATION

### A. Applicable Law

Section 3553(a) directs courts to consider a number of factors in determining an appropriate sentence. In this case, these factors indicate that a sentence of 24 months is sufficient, but not greater than necessary, to achieve the goals of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The key factors are the nature and circumstances of the offense and the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1), the need to afford adequate deterrence to criminal conduct, *id.* § 3553(a)(2)(B), and the need to protect the public from further crimes of the defendant, *id.* § 3553(a)(2)(C).

Although the Supreme Court's decision in *Booker* has rendered the Sentencing Guidelines advisory, the Guidelines still remain the "starting point and initial bench-mark" for sentencing. *Kimbrough v. United States*, 552 U.S. 85, 108, (2007) (internal quotation marks and citation omitted); *see Carty*, 520 F.3d at 991 (en banc); *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011). While there is no presumption of reasonableness for a Guidelines range sentence, if a district judge "decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure

---

[3] The Glock switches themselves count as firearms for purposes of the Guidelines calculation. 26 U.S.C. § 5845(a) provides: "The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

that the justification is sufficiently compelling to support the degree of the variance." *Carty*, 520 F.3d at 991-992 (citing *Gall v. United States*, 552 U.S. 38, 50, (2007)); *see also United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011) ("district court must start with the recommended Guidelines sentence, adjust upward or downward from that point, and justify the extent of the departure from the Guidelines sentence."). As the Supreme Court recognized in *Gall*, "a major departure should be supported by a more significant justification than a minor one." 552 U.S. at 50. Finally, "[a]s a general rule, the preponderance of the evidence standard is the appropriate standard for factual findings used for sentencing." *United States v. Armstead*, 552 F.3d 769, 777-78 (9th Cir. 2008); *see, e.g.*, *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir. 2010).

### B. Sentencing the Defendant to 24 Months' Imprisonment Would Vindicate the Interests Set Forth in 18 U.S.C. § 3553(a).

Defendant's crime necessitates a custodial sentence, both to assure the safety of the community and to deter defendant from the dangerous behavior that form the basis of this offense. The government respectfully submits that a 24 month sentence—the low end of the Guidelines range—is necessary to vindicate the goals of federal sentencing, and is also sufficient to do so. The defendant's conduct in this case was extraordinarily dangerous. There is no good reason why a person would order devices through the mail meant to transform already-dangerous weapons into machineguns. Even the most innocent explanation—that someone builds guns purely for hobby—makes our community more dangerous because of the presence of dangerous weapons.

Ordering Glock switches from China causes dangerous devices to come into our community and potentially cause significant harm. The fact that the defendant possessed multiple molds used to manufacture guns suggests that the defendant was making "ghost" guns, which are homemade guns built using molds like the ones the defendant possessed that do not have serial numbers or any way to trace them. Based on the evidence, it is likely that the defendant was then putting Glock switches on the homemade guns to make them fully automatic. The government notes that the defendant ordered Glock switches through the mail from China at least three times. The government intercepted one order (which formed the basis of the search warrant), and found another order in the defendant's bedroom, meaning at least one order of Glock switches was never recovered and may have been used to make machineguns

that are now on our streets and could fall into the hands of people who want to use them to cause harm. While the government does not have concrete evidence of what the defendant was doing with the guns he built, there is simply no innocuous reason to construct a homemade machinegun. At the very least, the defendant allowed for exceedingly dangerous weapons to enter our community.

Even if the defendant was telling the truth that he never fired the guns that he bought and that he only built the guns to give them to his family—and the government has no evidence to believe otherwise—the very fact that he admitted to building untraceable guns means that the defendant was engaged in extremely dangerous behavior that could lead to catastrophic results. There is a good reason why the manufacture and sale of guns is highly regulated, and guns have serial numbers: being able to trace guns to the individuals who bought them can prove invaluable for law enforcement when investigating a crime involving a gun. When people like the defendant build their own guns, they circumvent that process and create guns that are deadly and untraceable. Ordering Glock switches to make those guns fully-automatic only adds to the potential danger.

A sentence of 24 months, with three years of supervision to follow, should be an eye opening sentence for defendant. He has not spent considerable time in custody, so 24 months represents a significant increase in time away from society. He will have ample time to contemplate his dangerous criminal activity and take advantage of the educational and counseling opportunities that he will have in BOP custody.

The government's recommendation of a low-end Guidelines sentence takes into account the defendant's minimal criminal history and his family situation. The defendant's only prior felony conviction was in 2009, making it too old to count for Guidelines purposes, meaning he has not been convicted of a crime in more than a decade. Moreover, the defendant and his partner, Ms. Spingola, have a small child together and the defendant is actively involved in raising Ms. Spingola's child from a prior relationship. PSR ¶ 41. The defendant is very involved in parenting and is the "primary caretaker" for the children, as his partner is disabled. Furthermore, the defendant was shot in the arm in 2016 and was diagnosed with PTSD. Finally, the defendant has performed well on pretrial release; he pled guilty on July 18, 2019 and has been out on release since then with minimal violations (only two positive drug tests for marijuana in July 2019). Those mitigating factors, which are referenced in the PSR, are baked

into the government's recommendation here, making the recommended sentence sufficient but not longer than necessary to meet the sentencing objectives of section 3553. A custodial term of 24 months will hopefully provide defendant with an opportunity to reform, and provide safety for the community.

The parties' plea agreement also provides for defendant agreeing to a three-year term of supervised release that includes the following expanded search condition:

> The defendant shall submit his person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), and any property under defendant's control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state, or local law enforcement officer at any time, with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

Given the defendant's criminal conduct, specifically that the offense occurred in his own home and using materials he ordered through the mail, the requested condition is necessary to serve the interests of deterrence and rehabilitation. The Court should also order the forfeiture of the items set forth in the plea agreement, and impose the other conditions requested by the Probation Officer.

## V.  CONCLUSION

In full consideration of the defendant's history and characteristics, together with the goals of sentencing, the government respectfully requests that the Court sentence the defendant to 24 months in prison. The government also recommends that defendant's prison term be followed by three years of supervised release, the search condition and no contact condition described above, a $100 special assessment, and forfeiture of the firearms and ammunition involved in the offense.

DATED: July 24, 2020

Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
ROSS WEINGARTEN
Assistant United States Attorney